UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FILED

CO APR 24  PM 2: 13

TAMPA, FLORIDA

SHIRLEY BLAKE, individually, and
as President  of the Jordan
Park Residents' Management
Corporation n/k/a Jordan Park
Residents' Association; and
JORDAN PARK RESIDENTS'
MANAGEMENT CORPORATION,

        Plaintiffs,

CASE NO. *8: 00CV777-T-25B*

vs.

THE ST. PETERSBURG HOUSING     INJUNCTIVE RELIEF SOUGHT
AUTHORITY; and DARRELL J. IRIONS,  JURY TRIAL DEMANDED
individually, and as Executive Director
of the St. Petersburg Housing Authority,

        Defendants.

_____/

## VERIFIED COMPLAINT

Plaintiffs SHIRLEY BLAKE, individually, and as President  of the Jordan Park

Residents' Management Corporation n/k/a Jordan Park Residents' Association; and

JORDAN PARK RESIDENTS' MANAGEMENT CORPORATION n/k/a Jordan Park

Residents' Association sue Defendants THE ST. PETERSBURG HOUSING AUTHORITY;

and DARRELL J. IRIONS, individually, and as Executive Director of the St. Petersburg

Housing Authority, demand trial by jury and allege:

## STATEMENT OF THE CASE

1.     This is a civil rights action brought by Shirley Blake, individually and as

President of the Jordan Park Residents' Management Corporation n/k/a Jordan Park

Residents' Association and by Jordan Park Residents' Management Corporation n/k/a Jordan Park Residents' Association (Jordan Park RMC or RMC), which represents all public housing residents of Jordan Park located in St. Petersburg, Florida, to stop the demolition of Jordan Park, which is currently underway.   Jordan Park is operated by Defendant St. Petersburg Housing Authority ("SPHA").   Defendant Darrell J. Irions is the SPHA's Executive Director.

2.      The Defendants have conspired with the City of St. Petersburg, Florida and Mayor David Fischer to develop a plan to demolish 54 buildings at Jordan Park and build new structures, in violation of federal law.  The plan will, in effect, eliminate over 400 units of housing now desperately needed by impoverished families in St. Petersburg, and sometime in the future calls for the replacement of some of the buildings, in clear disregard of the statutory rights of an entire community of poor families to have a meaningful voice in the decisions affecting their future.   The clear effects of the Defendants' actions in reducing affordable housing opportunities and increasing homelessness will be felt most acutely by African-Americans, women, and children.

3.      On July 17, 1997, the SPHA filed with the U.S. Department of Housing and Urban Development ("HUD") an application under the HOPE VI Urban Revitalization Demonstration Program, under 42 U.S.C. § 1437l to revitalize Jordan Park.  (See Exhibit "A").  The application included a Revitalization Plan and provided for the demolition of only nine residential buildings, and only 59 units, and the renovation of the remaining 54 buildings.

4.      On April 21, 1999, after a series of meetings from which the RMC and

residents of Jordan Park were effectively excluded, the Defendants radically changed the original plan submitted with the July 17, 1997 HOPE VI Grant application for renovation of Jordan Park, and submitted to HUD what is hereinafter referred to as the "Demolition Plan." The Demolition Plan increased to 54 the number of residential buildings to be demolished, all of which serve "very low-income" residents, defined as persons whose income is 0%-50% of the area median income, and called for new buildings to be built on the same property.

5.      Unlike the renovation plan submitted with the HOPE VI Grant application, the Demolition Plan does not permit renovation of the majority of the residential buildings. Instead, it requires that over 80% of the residential buildings be demolished, and in the process over half of the units for residents will be lost, a net loss of approximately 200 very low-income rental units, which will have a disproportionate impact on African-Americans, women, and children. The Demolition Plan was not developed in consultation with the residents, the residents' advisory board, or residents' council, in violation of 42 U.S.C. § 1437p.

6.      The Plaintiffs bring this action directly under the provisions of:

a.      Title VIII of the Civil Rights Act of 1968, known as the Fair Housing Act, codified at 42 U.S.C. §§ 3601 et seq.; and

b.      Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000d.

7.      The Plaintiffs also sue under 42 U.S.C. § 1983 to enforce rights secured by:

a.      Section 18 of the United States Housing Act of 1937, concerning Demolition and Disposition of Public Housing, codified at 42 U.S.C. § 1437p;

3

      b.      The Urban Revitalization Demonstration Program amendments to the United States Housing Act of 1937, known as HOPE VI, Pub. L. No. 102-389, Title II, 106 Stat. 1579, reprinted at 42 U.S.C. § 1437l, note; and

      c.      The Uniform Relocation and Real Property Acquisition and Policies Act of 1970 (URA), 42 U.S.C. § 4601 et seq.

      8.      Plaintiffs seek an order declaring the Demolition Plan unlawful and seek injunctive relief prohibiting its implementation. Demolition of Jordan Park is currently underway.

### JURISDICTION AND VENUE

      9.      This court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331. Venue is proper in this judicial district under 28 U.S.C. § 1391(b).

### PARTIES

      10.      Shirley Blake is a Jordan Park resident of St. Petersburg, Pinellas County, Florida, and is President of the Jordan Park RMC, a resident management corporation under 42 U.S.C. §1437r.

      11.      Plaintiff Jordan Park RMC, was at all material times, a tenant organization representing the residents of Jordan Park, under 42 U.S.C. § 1437 p and r. The membership of the RMC is composed of each resident of Jordan Park. The activities, affairs, and property of the RMC is managed by an elected Board of Directors. All the RMC Board Members are African-American and are very low-income. The purposes and powers, among others, of the RMC are, inter alia:

      a.      To organize and support a viable resident organization in Jordan Park.

b.     To assure adequate maintenance of buildings and common areas.

c.     To inform residents as to their rights and responsibilities under Federal, State, City, and St. Petersburg Housing Authority regulations.

d.     To secure the cooperation of governmental agencies which have the responsibility to enforce laws and assist residents.

e.     To implement a program of Resident Management.

f.     To act as the advising body to the St. Petersburg Housing Authority and all public and private agencies with regard to the modernization projects or programs for Jordan Park.

g.     To seek the cooperation of Governmental agencies which have the responsibility for enforcing the law and assisting residents.

h.     To negotiate, agree upon and execute contracts, agreements or other binding relationships, on behalf of the tenants of the development with the St. Petersburg Housing Authority, other social agencies, and as otherwise deemed necessary and appropriate.

12.     Defendant the St. Petersburg Housing Authority (SPHA) is a public body corporate and politic organized under the laws of the state of Florida. The SPHA is a Public Housing Agency within the meaning of 42 U.S.C. § 1437 and administers federally subsidized and assisted low-rent housing as authorized by the United States Housing Act and implementing federal regulations.

13.     Defendant Darrell J. Irions, at all material times, has been the Executive Director of the SPHA. He is charged with establishing and administering the policies of the

5

SPHA, including those relating to the daily operation, administration and maintenance of all public housing in St. Petersburg.

## STATUTORY AND REGULATORY SCHEME

14.     The United States Housing Act of 1937 (USHA) declares that it is the policy of the United States "to promote the general welfare of the Nation by employing the funds and credit of the Nation . . . to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low income families." 42 U.S.C. §1437.

15.     The national housing goal is the realization as soon as feasible of "a decent home and suitable living environment for every American family."  42 U.S.C. §§1441, 1441a; 12 U.S.C. §1701t.

16.     In October 1992, Congress created the Urban Revitalization Demonstration Program ("URD"), otherwise known as HOPE VI ("Homeownership and Opportunity for People Everywhere"), which provided grants of up to $50 million to each participating municipality "to carry out an urban revitalization demonstration program involving major reconstruction of severely distressed or obsolete public housing projects to be administered by public housing agencies . . . ." Pub. L. 102-389, Title II, 106 Stat. 1579, reprinted at 42 U.S.C. § 1437l, note.

17.     The funding authorization for HOPE VI was section 14 of the USHA (42 U.S.C. § 1437l, note), which provided, in pertinent part, that:

a.     "each participating community shall submit a plan for program implementation which is consistent with the local comprehensive housing affordability strategy [now referred to as the "consolidated plan"] prepared pursuant to Section 105 of the

6

Cranston-Gonzalez National Affordability Housing Act [42 U.S.C. § 12705] and which has the approval of the local governing body";

b.      funds may be used "for the replacement of public housing units pursuant to Section 18 of the Act [42 U.S.C. § 1437p]"; and

c.      "persons displaced by the reconstruction activities provided for herein shall be eligible for these replacement units."

18.      In 1998, Congress amended the USHA by the passage of the Quality Housing and Work Responsibility Act of 1998 (QHWRA), Pub. L. No. 105-276, 112 Stat. 2518, Oct. 21, 1998.

19.      Section 522(a) of the QHWRA repealed section 14 of the USHA (42 U.S.C. § 1437l), the statute providing for HOPE VI program funding, and transferred HOPE VI program funding to 42 U.S.C. § 1437v, which was amended by section 535 of the QHWRA.

20.      Section 535 of the QHWRA substantially amended section 24 of the USHA (42 U.S.C. § 1437v).  While providing for continued funding of the HOPE VI program, it also established highly restrictive application selection and grant requirements.  See 64 Fed. Reg. 8192, 8204 (Feb. 18, 1999).  Only "severely distressed public housing," as defined by 42 U.S.C. § 1437v(j), remained eligible for HOPE VI Grants.  As discussed infra, the public housing units at issue in this case were not "severely distressed public housing," as defined by 42 U.S.C. § 1437v(j)(2).

21.      As it existed before being amended by QHWRA, section 18 of the USHA provides in pertinent part that:

a.      no public housing project or portion thereof shall be demolished

7

unless it can be demonstrated that it "is obsolete as to physical condition, location, or other factors, making it unusable for housing purposes, and no reasonable program of modifications is feasible to return the project or portion of the project to useful life; or in the case of an application proposing the demolition of only a portion of a project, the demolition will help to assure the useful life of the remaining portion of the project;" 42 U.S.C. § 1437p(a)(1);

      b.      any application from the public housing authority for the demolition of public housing must be "developed in consultation with tenants and tenant councils, if any, who will be affected by the demolition;" 42 U.S.C. § 1437p(b)(1); and

      c.      "all tenants to be displaced as a result of the demolition or disposition will be given assistance by the public housing agency and are [to be] relocated to other decent, safe, sanitary, and affordable housing, which is, to the maximum extent practicable, housing of their choice, including housing assisted under section 1437f [known as the Section 8 Certificate housing program] of this title;" 42 U.S.C. § 1437p(b)(2).

      22.      QHWRA did not materially alter the pertinent portions of section 18 of the USHA with respect to tenant consultations.

      23.      The URA and its implementing regulations provide as follows:

      a.      A displacing agency, before approving a project, must assess the characteristics and needs of the households to be displaced, 42 U.S.C. § 4625(c)(1), 49 C.F.R. § 24.205(c)(2)(i), and determine whether qualified replacement housing is available to meet those needs. 49 C.F.R. § 24.205(a)(2), 24 C.F.R. § 970.8(d)(3); HUD Handbook 1378, ¶¶ 2-2(e).

b.      The displacing agency shall assure that a person not be required to move from a dwelling unless the person has had a reasonable opportunity to relocate to a comparable replacement dwelling. 42 U.S.C. 4625(c)(3). Comparable replacement housing is defined as housing that is decent, safe and sanitary, adequate in size to accommodate the occupants, within the financial means of the displaced person, functionally equivalent, in an area not subject to unreasonable adverse environmental conditions, and in a location generally not less desirable than the location of the dwelling from which the person is being displaced with respect to public utilities, facilities, services, and the displaced person's place of employment. 42 U.S.C. § 4601(10).

c.      Wherever possible, minority persons shall be given reasonable opportunities to relocate to decent, safe and sanitary replacement dwellings, not located in an area of minority concentration, that are within their financial means. 49 C.F.R. § 24.205(c)(2)(C); HUD Handbook 1-29(c)(3).

24.     Title VIII of the Civil Rights Act of 1968 ("The Fair Housing Act"), 42 U.S.C. §§ 3601 et seq., provides that:

a.      "it shall be unlawful . . . [t]o . . . make unavailable or deny . . . a dwelling to any person because of race, color, . . . sex, [or] familial status . . . ." 42 U.S.C. § 3604(a); and

b.      "it shall be unlawful . . . [t]o discriminate against any person in the terms, conditions, or privileges of . . . rental of a dwelling, or in the provision of services of facilities in connection therewith, because of race, color, . . . sex, [or] familial status . . . ." 42 U.S.C. § 3604(b).

9

25.     Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

26.     The U.S. Department of Housing and Urban Development (HUD) has promulgated regulations implementing Title VI which are set forth at 24 C.F.R. Part 1. Those regulations provide, in pertinent part, that:

> A recipient, in determining the types of housing, accommodations, facilities, services, financial aid, or other benefits which will be provided under any such program or activity, or the class of persons to whom, or the situations in which, such housing, accommodations, facilities, services, financial aid, or other benefits will be provided under any such program or activity, or the class of person to be afforded an opportunity to participate in any such program or activity, <u>may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting persons to discrimination because of their race, color, or national origin</u>.

24 C.F.R. § 1.4(b)(2) and (3) (emphasis added).

## FACTUAL ALLEGATIONS

### Jordan Park's History and Demographics

27.     Built between 1938 and 1942, Jordan Park is a 25-acre family public housing development located on the south side of St. Petersburg.  It contains 63 one- and two-story buildings, and 446 dwelling units.  Approximately 2,300 residents lived in Jordan Park until displacements associated with the HOPE VI Grant began.

28.     As of July 17, 1997, the residents of Jordan Park had a median income of $7,088, only 24% of the area median income.  Only 9% had "earned income."  The HUD

10

published median family income designation in St. Petersburg for Low Income Housing Tax Credit (LIHTC) developments is $40,500 for a family of four. Therefore, virtually all families residing in Jordan Park are very low-income (0 - 50% of area median income).

29.     As of July 17, 1997, approximately 99% of the heads of households at Jordan Park were African-American. Approximately 85% of the residents of Jordan Park were female and 60% of the residents were 18 years of age or younger. One-third of Jordan Park residents, as of July 17, 1997, were younger than age 5.

30.     As of July 17, 1997, more than 900 families were on a waiting list to move into Jordan Park.

31.     "Jordan Park is a place about which people feel strongly because of its history and many opportunities it provided to the families of St. Petersburg over the last half century." (See Exhibit "A," HOPE VI Grant application, at page 18.)

## Defendants Systematically Dismantle Public Housing, Displacing the African-American Residents

32.     In the 1980s, the City of St. Petersburg began efforts to bring Major League Baseball to St. Petersburg. City leaders determined that the stadium should be located near the site of a public housing project known as "Laurel Park." Eventually, to support parking, the residents of the 168 units of Laurel Park were moved out, and the buildings were flattened. Then, a parking lot was built on top of Laurel Park. Other predominantly black neighborhoods were condemned and residents forced to sell and move to make more room for parking lots for the baseball stadium now called Tropicana Field.

33.     To appease angry displaced residents and leaders of the black community, St.

11

Petersburg city officials implied that new housing would be constructed to assist those displaced so that the people of St. Petersburg could have a baseball stadium and room to park their automobiles.

34.     As time passed, the St. Petersburg city officials recognized that the image of the all-African-American Jordan Park public housing units in the vicinity of Tropicana Field did not reflect well on the city.

### Defendants Conspire with Mayor and St. Petersburg to Demolish Jordan Park

35.     At some point prior to 1996, Defendants Irions and the St. Petersburg Housing Authority conspired with the Mayor David Fischer and the City of St. Petersburg to pursue the complete demolition of Jordan Park. The residents of Jordan Park vehemently opposed its demolition, as did the RMC.

36.     On October 2, 1996, Sevell C. Brown, III, President of the Southern Christian Leadership Conference/St. Petersburg - Pinellas Chapter, submitted to Congressman Bill Young 140 signatures of Jordan Park residents who were described as "vehemently opposed to the demolition of Jordan Park." (See Exhibit "B ").

37.     On October 5, 1996, then-president Moses Simmons of the Jordan Park RMC wrote a letter to Congressman Bill Young requesting his "immediate intervention to stop the demolition of the Jordan Park Housing Project in St. Petersburg, Florida. The Jordan Park RMC is strongly and unequivocally opposed to the demolition of Jordan Park and the present Jordan Park Redevelopment Project that has been submitted by Mr. Darrell Irions and approved by the St. Petersburg Housing Authority Board of Directors and the St. Petersburg City Council." (See Exhibit "C ").

38.     At all material times, the SPHA was required to recognize that the RMC represents the interests of Jordan Park residents, especially as those interests relate to the redevelopment of Jordan Park, and, further, the SPHA was required to recognize the RMC as the sole representative of the residents of Jordan Park, as required by federal regulation. See 24 C.F.R. § 964.18(a)(1).

39.     Under federal housing statutes and regulations discussed infra, tenant organizations such as the RMC are to be afforded a meaningful opportunity to participate in the planning, development, implementation and monitoring of local urban revitalization programs, such as the plan for redevelopment of Jordan Park.

40.     The RMC has acted as the organized advocate for residents and former residents of Jordan Park who have been displaced or threatened with displacement by demolition, rehabilitation or construction activities at Jordan Park; is responsible to give such individuals a meaningful voice in and opportunity to participate in the planning and implementation of HOPE VI and other projects which are intended to revitalize public housing in Jordan Park; is involved in efforts to prevent and address discrimination against Jordan Park residents; and works with residents and the SPHA and other governmental entities to promote access to and retention of opportunities for residents to obtain safe, decent and affordable housing.

41.     The desire to demolish Jordan Park was perceived as another decision that would erode the political base of the minority community by destroying a place with an important history for many in the community as home, as memory, and as future opportunity. In fact, the attempt to demolish Jordan Park would, as a secondary gain to those in favor of

13

suppressing black political power, further decrease the concentration of black voters in the districts encompassing Jordan Park -- in effect, a de facto effort to redistrict St. Petersburg.

42.     Racial tension in St. Petersburg reached a crescendo in the late summer of 1996 when a black youth was shot to death by a white St. Petersburg Police Department officer.  Violence gripped the city, and rioting, looting, and burning made the city of St. Petersburg a national eyesore in October and November 1996 -- a presidential election year.

## Racial Violence Forces Defendants to "Shelve" Plans to Demolish Jordan Park

43.     Shortly thereafter, Albert Gore, Vice President of the United States, appointed the "Federal Interagency Task Force on St. Petersburg" to coordinate federal assistance to assist St. Petersburg, ease racial tensions and recover from the devastating riots.

44.     During the last weekend of November 1996, then-HUD Secretary Henry G. Cisneros was dispatched to St. Petersburg by White House Chief of Staff Leon Panetta "to assess how the federal government can help the community in the wake of two violent disturbances following the fatal shooting of a young African American after a traffic stop."

45.     As part of his visit, the HUD Secretary met with residents of Jordan Park, who told him of the Defendants and the Mayor's plans to demolish Jordan Park.  Moved by what the Jordan Park residents told him, Secretary Cisneros demanded that the Defendants and the Mayor shelve any demolition plans for Jordan Park.  He proposed instead to provide model replacement housing and undertake some housing rehabilitation before any plans for demolition are considered.

14

**A HOPE VI Grant Application is Submitted, Saving Jordan Park from Demolition**

46.     Defendants were hostile to any plan other than the complete demolition of Jordan Park, but under the spotlight of the Federal Interagency Task Force on St. Petersburg, and fearing legal and public relations reprisal from Jordan Park residents and other black community leaders, Defendants began efforts to prepare a HOPE VI Grant application which called for the renovation of Jordan Park, and scrapped the efforts to demolish it.

47.     The Telesis Corporation was hired by the SPHA as a consultant to assist in the preparation of the HOPE VI Grant application. Telesis Corporation had a proven track record of not only assisting in the development of HOPE VI Grant applications, but also in overseeing the revitalization process, and had administered revitalization projects for HUD.

48.     The Jordan Park residents and RMC were concerned throughout the process of preparing the HOPE VI Grant application that the SPHA "may have a closed mind regarding the revitalization plan and that key community figures" had "conflicts of interest."

49.     Not only did the SPHA favor demolition, but so did apparently the federal officials. On June 14, 1997, Stephanie Owens, consultant for the Federal Interagency Task Force on St. Petersburg, met behind closed doors with RMC officer Shirley Blake, President, and Dolores Fletcher, Vice President. Ms. Owens intimidated and pressured these RMC board Members to accept demolition, and abandon renovation of Jordan Park. The pressure was so intense, that Ms. Fletcher was reduced to tears. (See Exhibit "C-1").

50.     On June 18, 1997, Ms. Blake and Ms. Fletcher attended another meeting in their office with Ms. Owens, Owens' grandmother, Harry Harvey and Dr. Arnett Smith, all on the Board of the local NAACP. Mr. Harvey at that time also served on the St. Petersburg

15

Housing Authority Board of Commissioners.  Together, these so-called community leaders attempted to intimidate and pressure Ms. Fletcher and Ms. Blake into endorsing the plan to demolish Jordan Park, and to abandon plans to renovate Jordan Park.  The pressure and intimidation was so intense, that Ms. Blake left the meeting in tears. Ms. Blake felt intimidated because she was not as prominent or as educated as some of the people who were cajoling her into endorsing demolition. Although Ms. Blake was frightened and crying, she made it clear she could not support the demolition because she had a responsibility to the people of Jordan Park. (See Exhibit "C-1").

51.    Throughout the HOPE VI Grant application process the RMC and Jordan Park residents refused to back down from their desire to renovate the historic Jordan Park housing project.  Telesis reached a conclusion that renovation was feasible and that the buildings were "structurally sound."  Defendants, having no viable means to enforce their demolition agenda, agreed to submit a HOPE VI Grant application calling for substantial renovation of Jordan Park.

52.    On July 17, 1997, the SPHA filed with HUD an application for a 42 U.S.C. § 1437l HOPE VI Grant ("original HOPE VI application") for $27 million to revitalize the Jordan Park development.  The SPHA proposed to demolish nine buildings for a total loss of 59 units.  The SPHA proposed to replace the 446 units by combining  two units into one, reducing the overall number of units to 223, but not all within the boundaries of what is now Jordan Park.  Instead, the SPHA determined that low income people should not live together -- as had been the case for over 40 years -- and that the low income tenants of Jordan Park

should be dispersed to various locations in the city of St. Petersburg. The HOPE VI Grant sought was intended to fund most or all of the new construction units. (See Exhibit "A").

53.     Although the RMC and Jordan Park residents were not opposed entirely to the Telesis plan, they had serious concerns and reservations about not only the plan, but also the exclusion of their participation in the development of the HOPE VI Grant application. Their feelings were made known to the SPHA. (See Exhibit "D", Letter to Honorable Senator Bob Graham dated September 19, 1997 from President Shirley Blake).

54.     Specifically, Ms. Blake told Senator Graham the following:

a.      The RMC position and Jordan Park's residents' position is not reflected in the HOPE VI Grant application which requires that certain buildings be demolished.

b.      "The Jordan Park RMC has been purposely excluded from the final review process to determine what was or was not included in the HOPE VI GRANT APPLICATION that was submitted to HUD by the July 18, 1997 deadline by Telesis Corporation of Washington, D.C."

c.      Secretary Cisneros' efforts to enfranchise and empower the Jordan Park RMC has "been undermined, sabotaged, and reversed by the Rev. J. W. Cates, Chairman of the SPHA Board, SPHA Board Commissioners, Mr. Darryl Irions, Executive Director of the SPHA, Mayor David Fischer, Mr. Ernest Fillyau, Chairman of the St. Petersburg City Council, Ms. Garnell Jenkins, local NAACP President and Ms. Stephanie Owens, the Federal Coordinator for the President's Federal Interagency Task Force." (Exhibit "D" at page 1).

d. The Federal Interagency Task Force is perceived as powerless and has been stripped of any influence to bring to a halt the practice of the politics of exclusion by Reverend Cates, Mr. Irions, and the SPHA.

e. The Federal Interagency Task Force was not even able to "accomplish the simple task of making sure that Mr. Irions provide multiple phone and fax lines, a copier, and a computer for the Office of the Jordan Park RMC. . .." (Exhibit "D" at page 1).

f. "The Jordan Park RMC and the residents of Jordan Park were denied a public hearing before the City Council of a vote by Council on the HOPE VI GRANT application. Council Chair, Ernest Fillyau and Mayor David Fisher purposely did not place the item on the Council's agenda and the addendum to the agenda to exclude the RMC and public from its input." (Exhibit "D" at page 2).

g. St. Petersburg City Council Chairman Ernest Fillyau falsely told the Council that he represented the residents of Jordan Park and demanded that the Council trust him in this decision and "for 45 minutes brow beat the Council into voting on the HOPE VI application without the input of the Jordan Park RMC. Mayor Fisher backed every lie told by Mr. Fillyau." (Exhibit "D" at page 2).

h. "Mayor David Fischer and his staff have ignored and refused to initiate any official action to establish Jordan Park as a national historic site because the City wants the land for extending the business corridor for professional baseball." (Exhibit "D" at page 3).

       i.      Mr. Irions intimidated elderly residents of Jordan Park who have lived in Jordan Park for over forty years during the HOPE VI grant application process and throughout the development of the demolition plan.

       j.      Stephanie Owens, the consultant for the Federal Interagency Task Force on St. Petersburg attempted at meetings on June 21 and June 28, 1997 to speak for the RMC; however, Ms. Blake and other Members of the RMC Board of Directors were present, and announced that Ms. Owens did not speak on their behalf, and that the RMC did not agree to the demolition of Jordan Park.

       k.      Ms. Owens also intimidated Sevell Brown after a meeting on June 21, 1997, telling him that if he did not "back off" supporting the preservation and renovation of Jordan Park, she would report him to Dr. Joseph L. Lowrey, the National President of the Southern Christian Leadership Conference, of which Mr. Brown is President of the SCLC/St. Petersburg - Pinellas Chapter.

    55.      On September 30, 1997, the Jordan Park Residents Management Corporation issued a press release officially requesting that the Regional Director on the US Commission of Civil Rights, Mr. Bobby Doctor, return to St. Petersburg and convene official hearings after Mayor David Fischer excluded the RMC from participating in meetings discussing the HOPE VI revitalization grant application. (See Exhibit "E").

    56.      In fact, on several occasions Mr. Doctor himself was excluded from meetings by Defendants.

    57.      On October 3, 1997, HUD announced that the HOPE VI Grant application had been approved. On January 15, 1998, HUD formally approved the application, and

awarded a $27 million HOPE VI implementation grant to carry out the revitalization of Jordan Park.  Under the Grant Agreement, the SPHA was required to "comply with the provisions of section 18 of the 1937 Act [USHA] . . .."  (See Exhibit "F" at page 6).

58.     After learning that the HOPE VI Grant application had been approved, RMC President Blake wrote to Darryl Irions on October 3, 1997, stating, "I've been directed by Secretary Andrew Cuomo to inform you that we have discussed with him some of our concerns of the HOPE VI Grant that has been awarded St. Petersburg.  Secretary Cuomo has empowered us, as former Secretary Cisneros did, to be the resident entity that the SPHA should recognize and deal with on all aspects of the awarded HOPE VI grant. . . . Since we have never officially reviewed or received from you, Telesis Corporation or Ms. Stephanie Owens a copy of the HOPE VI grant application prior to July 18, 1997 and to date, please provide us an official copy of the application."  (See Exhibit "G").

59.     By October 8, 1997, the problems with Irions and his efforts to thwart the RMC's involvement in the discussions following the HOPE VI Grant Award had reached such a level, that RMC President Blake wrote to Representative Maxine Waters advising her that certain officials from the HUD offices had "conducted themselves in an extremely insensitive and disgusting manner.  They refused to answer any of the RMC's questions about the HOPE VI GRANT and in fact stopped the Jordan Park Resident Management Corporation officers and Board members from asking any further questions and demanded that we attend a series of meetings by Friday on accepting the HOPE VI GRANT."  (See Exhibit "H").

20

60.     Ms. Blake asked Representative Waters to "request the Secretary to stop his representatives from these tactics of duress and permit us the necessary time and technical assistance in the form of a consultant to intelligently review the official HOPE VI application that was delivered to us only two hours before our meeting with his representatives. Every request made in our 10/3/97 letter to Mr. Darryl Irions [sic], Executive Director of the SPHA (St. Petersburg Housing Authority) has been ignored. Mr. Irions will not communicate to us in writing." (See Exhibit "H").

61.     After a HOPE VI Grant is approved, HUD requires the Public Housing Agency to prepare and submit an implementation plan -- called a Revitalization Plan -- detailing how the Grant will be used.

62.     The HOPE VI Grant application submitted by the SPHA on July 17, 1997 already included a "Description of Physical Revitalization Plan," proposing that only nine buildings would be demolished and that the remainder would be renovated.

## Defendants Reemerge with Plot to Abandon Plan Submitted in HOPE VI Grant Application and Demolish All but Nine Buildings of Jordan Park

63.     Despite the submission of the HOPE VI Grant application plan to renovate Jordan Park, Defendant Irions had no intention of revitalizing Jordan Park, but intended all along to reinstate his and the SPHA's vision of a complete demolition of Jordan Park as soon as the uproar following the riots and federal task force involvement subsided.

64.     After the presence of the Federal Interagency Task Force on St. Petersburg faded in 1997, and the publicity and spotlight cast on St. Petersburg as a result of the October and November 1996 riots eased, and after the Jordan Park tenants had been led to believe that

the revitalization plan submitted with the HOPE VI Grant application was the intended plan of operation, Defendant Irions reemerged with a plot to use the HOPE VI Grant money awarded by HUD to demolish Jordan Park.

65.     After the HOPE VI Grant was approved, Defendant Irions took several initial steps to cancel the revitalization of Jordan Park and pursue its demolition.  First, because Irions knew that the RMC anticipated that Telesis would bid on the work to be accomplished in renovating Jordan Park with the $27 million HOPE VI Grant awarded,   Irions had to come up with a way to prevent Telesis' involvement.

66.     Irions knew Telesis would not support Irions' agenda of demolishing Jordan Park since Telesis had already opined that the existing buildings in Jordan Park were structurally sound and that renovation could be accomplished for approximately $55.00 per square foot.  Irions knew that for Telesis to support Irions' demolition agenda, Telesis would have to essentially acknowledge that the renovation plan Telesis developed for the HOPE VI Grant was economically and practically infeasible.  Irions knew that Telesis, because of its reputation, would not support Irions' demolition agenda.

67.     To disguise his plan to prevent Telesis' involvement, Irions decided to appoint a "Steering Committee" to develop the new plan, even though the HOPE VI Grant application contained the "Description of Physical Revitalization Plan."  Irions appointed several Members to the Steering Committee who Irions knew had favored demolition over renovation.     Irions also decided to hire a consultant to assist in developing a new Revitalization Plan.

22

68.     Second, to ensure that Telesis was not able to bid on the HOPE VI implementation consultant's contract, Irions solicited bids for the work to be performed without consulting or advising or inviting Telesis. A company named Sylla was selected by Defendant Irions after Irions was assured that Sylla would support demolition and criticize the Telesis opinion that revitalization was economically feasible.

69.     Third, because Defendant Irions was aware that 42 U.S.C. §1437p required the Secretary of HUD to disapprove any plan not developed in consultation with the resident advisory board and resident council, if any, of the project (or portion thereof) that will be affected by the proposed demolition or disposition, Irions decided to strong arm the RMC's Board of Directors into changing their minds and accepting the demolition of Jordan Park.

### Defendant Irions Intimidates the RMC Board

70.     Defendant Irions first attempted to convince RMC President Shirley Blake that, despite the HOPE VI Grant application and the broad-based support for renovating Jordan Park, demolition was in her best interest. President Blake made it clear that she and the RMC and Jordan Park expected renovation and that the issue of demolition was rejected when HUD approved the HOPE VI Grant application.

71.     Undaunted, Defendant Irions asked RMC President Blake to have lunch with him amidst the formation of the Steering Committee. Irions brought another RMC Board Member, Georgene Holloway, and several staffers. Ms. Blake presumed that the purpose of the lunch was to discuss the pertinent issues, such as displacement of residents while the Jordan Park buildings were renovated. Instead, Irions intended to put pressure on Ms. Blake in a public setting and in the presence of Ms. Blake's peers and other community leaders.

72.     The lunch took place at a Piccadilly's Cafeteria, and during the lunch several "community leaders" who were not Jordan Park residents greeted Irions in Ms. Blake's presence, promising that Jordan Park would be demolished, and that renovation plans would be scrapped. Ms. Blake was astonished to hear that Irions' plan to demolish Jordan Park was still being discussed, and made it clear that her mind had not changed and would not change.

73.     Despite the failure of Irions' Piccadilly lunch ambush, Irions continued to intimidate and attempted to coerce RMC President Blake into endorsing demolition.

**Defendant Irions Bribes a RMC Board Member to Support Demolition**

74.     Around the same time, Irions appointed Ms. Holloway to the Steering Committee. Ms. Holloway, who was on the RMC Board of Directors, was originally adamantly opposed to the demolition of Jordan Park. Irions thought that appointing a RMC Director to the Steering Committee would create the illusion that the RMC approved of the Steering Committee's actions. Finally, Irions bribed Ms. Holloway by promising that if she supported demolition while serving on the Steering Committee, then she would be given preferential and favorable treatment by Irions when the new housing was constructed after Jordan Park was demolished. Ms. Holloway quickly acquiesced to Irions' demolition agenda.

75.     Ms. Alma Wright, treasurer of the Jordan Park RMC, overheard Ms. Holloway bragging about the bribe Irions had given her. After the HOPE VI Steering Committee process had finished, Ms. Holloway was in a common area at Jordan Park, drinking. She bragged that she had changed her mind and voted in favor of demolition of Jordan Park because the "Housing Authority" had promised her a house in exchange for her

24

vote for the demolition. Ms. Wright asked Ms. Holloway how "could she do something like that, when you were placed on the steering committee to vote the RMC Board's interest?" Ms. Holloway responded as follows: "F--k Jordan Park, I already got me a house. They can demolish this Bitch for all I care. Me and my daughter and grandchild got a house." (See Exhibit "I").

**Defendant Irions Terrorizes the RMC Board in an Effort to Disable the RMC**

76.    Irions finally realized that RMC President Blake and the other Board Members of the RMC could not be bribed, as had been accomplished with Ms. Holloway. Defendant Irions decided that he could circumvent 42 U.S.C. §§ 1437p and r, if the RMC was disabled. Irions, through associates, "led one campaign after another to intimidate, harass, undermine and destroy the credibility" of Plaintiffs. (See Exhibits "J" and "K").

77.    Defendant Irions and his agents systematically disenfranchised the RMC through the following acts:

    a.    Attempting to coerce RMC President Blake to endorse his and SPHA's plan to demolish Jordan Park;

    b.    Failing to secure President Blake's endorsement of the demolition plan, Mr. Irions sought the assistance of RMC Board Members to spread disinformation and draw into question President Blake's competency. David Pierce, an Irions' associate, posted a flyer on residents' doors entitled "Ready to Move????" Mr. Pierce falsely stated that the RMC board has:

> elected to purchase Jordan Park despite what this action will have on HOPE VI. If they are successful, then there will be no HOPE VI $$$. This means no special Section 8 vouchers, relocation money, home ownership programs, community

25

building & supportive services programs, or a newly rebuilt Jordan Park. Instead, HUD will take the money back and we, the residents of Jordan Park, will be stuck in the projects or even homeless. The Jordan Park development will no longer be public housing, instead, it will become private property under private management. The residents will have to pay what the management wants us to pay (whether we can afford it or not) or be out on the streets. Come out and voice your opinion and don't let the RMC board decide or dely our future!!!"

(See Exhibit "L").

c.      Encouraging agents to stalk President Blake, in an effort to intimidate her into endorsing the demolition plan;

d.      Denying key community groups and RMC members from the Steering Committee to prevent the Jordan Park residents and tenants from meaningful opportunity to participate in the Revitalization Plan process;

e.      Interceding and preventing any RMC officers and Ms. Blake from appointment to the SPHA;

f.      Conspiring with Mr. Pierce to post bills and flyers accusing President Blake of drug dealing in Jordan Park. On November 5, 1998, President Blake sought legal advice to stop the terrorism of Irions. Among other things, Ms. Blake wrote that:

i.      Her name had been libeled "as part of a strategy to force [her] out of [her] duly elected office as president of the Jordan Park RMC (Resident Management Corporation) which is duly recognized by HUD under federal guidelines to represent some 200 families of single mothers and elderly seniors of a St. Petersburg, Florida federal housing project."

ii.      Mr. Irions "has used handpicked residents, though promises of providing them new low-income moderate homes, to initiate this harassment in the form

26

of smear campaigns designed to undermine my credibility as a person, employee, and president of the RMC. The persons he is using to foster this smear campaign are David Pierce "Puncho", Ray Plumer [sic] and another female resident in collusion with Mr. Irions. <u>They have passed out flyers to this effect while at the same time spreading innuendo and rumors the myself [sic] and the single mothers that make up the RMC Board are drug users and trafficers. [sic]"</u>

        iii.    "[T]he ultimate goal of the attack upon me is to cause the 200 families I represent to stop trusting and believing in me while they initiate a campaign to remove me from office as president of the RMC. .... The reason Mr. Irions wants me removed is because I am standing in the way of him, Rev. J. W. Cates, chairman of the SPHA Board, and Mayor David Fisher (City of St. Petersburg) from receiving a 27 million dollar HUD Hope VI Revitalization Grant that would implement a plan to demolish the majority of the 65 buildings in Jordan Park. I am opposed to that Revitalization Plan and support the first Revitalization Plan submitted to HUD that gained us the approval of the 27 million dollar grant."

(See Exhibit "M").

        g.    Conspiring to stack the RMC Board through improper appointments of Felicia Trammer and Ruth Pettis;

        h.    Sending a Ms. Cooper and Mr. Machorn to a meeting of the RMC officers, demanding that Ms. Blake sign a letter acknowledging that she had resigned from the Board, when she had, in fact, not resigned from the Board. (Exhibit "D").

i.      Encouraging another RMC Board Member, Delores Fletcher, to solicit Ray Plummer, another Irions associate, to break into the RMC files with a crow-bar and steal files containing information on the RMC's members and their efforts to oppose the demolition of Jordan Park;

j.      Encouraging agents to access the RMC office and steal office equipment, and files, in an effort to intimidate and disenfranchise the RMC;

k.      Failing to take action upon learning that the RMC office had been broken into and ransacked and pilfered by Plummer;

l.      Discouraging community police officer Lerric Boyd  of the St. Petersburg Police Department from investigating the Plummer break-in;

m.      Permitting SPHA staffers to give keys to the RMC office to unauthorized persons;

n.      Permitting the theft of RMC office equipment and telephone lines;

o.      Refusing to recognize the RMC and later the RA as the tenants' representative. Irions recommended to the St. Petersburg Housing Authority that it refuse to recognize the RMC because the RMC had lost its designation due to Mr. Irions' staffer's failure to file the necessary paperwork to maintain its not-for-profit status.

p.      Recognizing Plummer as a RA Board Member, even though Plummer had lost an election;

q.      Encouraging non-Jordan Park residents, including the local NAACP President and her Board Members, to disparage RMC President Blake publicly and privately in an effort to diminish President Blake's and the RMC's status and authority;

28

r.      Conducting biased surveys suggesting demolition was more favorable than renovation;

s.      Conducting surveys without RMC participation or endorsement in an effort to diminish RMC's status and authority;

t.      Attempting to overthrow RMC President Blake by intentionally failing to file paperwork necessary to preserve the RMC as a non-profit corporation, thereby causing it to be dissolved. The dissolution of the RMC required the creation of a Residents' Association, which in turn required new elections of officers;

u.      Intentionally failing to provide assistance, money, and technical support to the RMC as required under a Memorandum of Understanding entered into between Irions and the SPHA and the RMC;

v.      Encouraging the disruption of RMC meetings on the HOPE VI grant through the use of physical violence  (See Exhibits "J", "K" and "N");

w.      Bribing RMC members with promises of favorable treatment in the temporary assignment to good, clean Section 8 housing, and permanent assignment to replacement housing in exchange for support of demolition over renovation;

x.      Intentionally displacing RA Board Members so that the RA could not achieve a quorum to vote on RA business, and refusing to schedule elections to maintain a quorum;

y.      Appointing a "Steering  Committee" consisting of handpicked representatives known to be in favor of the demolition of Jordan Park to assist in the

preparation of the Demolition Plan, despite the preparation and approval of a Revitalization Plan in the original HOPE VI Grant Application.

78.     The Defendants and others held closed-door meetings to create their own plan for the demotion of Jordan Park. Plaintiffs and others, including federal officials, were excluded from these meetings.

79.     Routinely, during the development of the HOPE VI Demolition Plan, Defendant Irions intentionally delayed notification of the meeting to Ms. Blake and others and refused to permit transportation of the Jordan Park residents to SPHA meetings so that the attendance at these meetings was inadequate, leading to the impression of apathy.

80.     At one point, even Mayor Fischer tried intimidation tactics when the RMC refused to yield to the demolition of Jordan Park, threatening that if the RMC officers did not acquiesce to an immediate vote on the HOPE VI revitalization grant, the City of St. Petersburg and Jordan Park would "lose" the possible $30 million dollars in HOPE VI revitalization grant funds being sought. The Mayor's intent was to force a quick vote before the RMC had time to consider what was contained in the HOPE VI grant application. (Exhibit "E").

81.     Irions was also in league with Aisha Williamson, Community Relations Involvement Specialist from the HUD Jacksonville office, who supported demolition. Ms. Williamson refused to let the Jordan Park RMC Board of Directors bring advisors to official meetings following the HOPE VI Grant application approval. Defendant Irions on one occasion directed Ms. Williamson to throw out a RMC advisor.

**Defendant Irions' Appointed HACC Board Member Assaults RMC Board Member**

82.    Towards the end of the development of his Demolition Plan, Irions' associates terrorized Jordan Park residents and anti-demolition activists with violence.  A series of public hearings was scheduled while the Steering Committee was in the process of preparing a plan which called for the demolition of Jordan Park.

83.    The Housing Authority Community Council (HACC) -- a Board appointed by Irions -- held a meeting on January 21, 1999 to update Jordan Park residents on the Steering Committee's progress.  A discussion arose over the preservation of Jordan Park Elementary School and asbestos.

84.    After listening to the HACC Board's presentation of inaccurate information, a gentleman questioned why demolition was being proposed and asked questions about certain modifications that the HACC said could not be made, such as central heat and air. Mr. Pierce, a HACC Board member appointed by Defendant Irions, yelled at the man and told him to "shut up, and sit down."  When the man raised his hand to ask another question, Pierce left his seat, cursing at the man, and threatening to strike him.  (See Exhibit "N").

85.    A female staffer from Irions' office attempted to stop Pierce's charge, but Pierce knocked her out of the way with his forearm.  Ms. Wright, the RMC Treasurer was also in the audience at the meeting.  After Pierce knocked the white female staffer out of the way, Ms. Wright also tried to stop Pierce's charge, begging him to control himself.  Pierce battered Ms. Wright and continued charging the man who had asked the questions, until several men -- including Mayor Fischer's Chief of Staff, Don McRae --, wrestled Pierce out of the building.  (See Exhibits "N" and "O").

86.    Pierce's actions occurred in the presence of St. Petersburg police officer Boyd, who was a fellow HACC Board Member, but Officer Boyd sat in his chair and watched Pierce assault the two women and charge the man asking questions. Boyd offered no assistance. (See Exhibits "N" and "O").

87.    Even after being physically thrown out of the meeting hall, Pierce later returned with a box cutter in an effort to retaliate against the man who had simply asked questions. Formal complaints were filed with the St. Petersburg Police Department and the Sixth Circuit State's Attorneys' Office, and Gloria Freeney signed an affidavit describing the box cutter incident. The meeting was also captured on videotape.

## RMC Members Avoid Meetings, in Fear of Violence

88.    Word of the HACC's Board Member's violence at the public meeting spread through the residents of Jordan Park. Many of the elderly residents became frightened at the prospect of physical violence and refused to attend meetings.

89.    Mr. and Mrs. J.B. Hampton were afraid to attend meetings: "We have been lied to so many times in so many meetings, that it became discouraging to attend any meetings. Irrational behavior by irrational people in our meetins [sic] made it often times uncomfortable to attend meetings." (See Exhibit "P")(See also Exhibits "Q"-"S").

90.    Moreover, the failure by Officer Boyd to stop Pierce's assaults or to investigate the RMC office break-in fostered a sense of despair and distrust of the SPHA, Irions, Mayor Fischer and the city of St. Petersburg.

91.    After months of terrorist actions, subterfuge, disinformation, and propaganda, the Jordan Park residents and RMC were effectively silenced.

**Defendant Irions' Demolition Plan is submitted to HUD**

92.     On or about April 21, 1999, the St. Petersburg Housing Authority submitted

a HOPE VI Revitalization Plan ("Demolition Plan") which, contrary to the HOPE VI Grant

application, provided for the demolition of Jordan Park. (See Exhibit "T"). The Demolition

Plan provided for the development of housing to, in part, replace the demolished housing.

Ultimately, HUD approved the Demolition Plan.

93.     In its Demolition Plan, the SPHA asserted that the buildings' obsolete

physical condition makes them unusable for housing purposes, and no reasonable program

of modifications is feasible to return the buildings to useful life.  However, in the original

HOPE VI Grant application, the SPHA argued that the buildings were structurally sound and

suitable for renovation.

94.     The Demolition Plan submitted by Direction Irions contained other false

statements.  Specifically, the Demolition Plan states that the "[t]he initial resistance to

demolishing the buildings was overcome, in favor of building new dwelling units in an

organized and coherent neighborhood design." (See Exhibit "T" at page 1-4). Defendant

Irions knew that this statement was false, that the Demolition Plan had been developed not

only without consulting with the residents, but against their wishes, and that his actions and

the actions of others had created an atmosphere of fear and repression.

95.     Additionally, the Demolition Plan submitted to HUD falsely stated that

"[s]ince the HOPE VI grant has been approved by HUD, SPHA has held a series of meetings

with Jordan Park residents, SPHA staff, SPHA Board of Commissioners, HUD officials from

Washington, D.C., HUD technical assistance team assigned to the project, and the HOPE VI

steering committee that is overseeing the revitalization plan. Many ideas, perspectives, and revisions to the initial revitalization concept emerged during these meetings and provided the basis for the creation of this revitalization plan for implementing the HOPE VI program." (See Exhibit "T" at 1-2).

96.     The Demolition Plan submitted by the St. Petersburg Housing Authority will have a disproportionate impact on African-Americans, women, and children due to the fact that the majority of families will be displaced from the 54 buildings designated for demolition, and these people are considered "low income" earners.

97.     The Demolition Plan also unlawfully conflicts with the city of St. Petersburg's 1995 Consolidated Plan for 1995 (Consolidated Plan) submitted to HUD.

98.     The Consolidated Plan included the following priorities, including, among others, specific strategies to implement those priorities:

        a.      "Preserve existing suitable housing stock."

        b.      "[R]ehabilitation of existing substandard tenant an owner occupied housing . . .." (See Exhibit "U").

99.     The Demolition Plan calls for construction of new units, but almost all of the displaced Jordan Park residents will be ineligible for occupancy. Unlike the plan in the original HOPE VI Grant application, the Demolition Plan will result in strict rental policies which will discriminate against African-Americans, women and children. Of the 236 units to be constructed under the Demolition plan, 67% of those units will be available only to people whose median income exceeds 20% of the area median income, whereas only 9% of

Jordan Park residents have earned income and almost all make less than 20% of the area median income.

100.    In developing and implementing the Demolition Plan, Defendants have failed to consult with the residents of Jordan Park, and have excluded the RMC and violated their rights under 42 U.S.C. §§ 1437 r and p.

101.    In violation of the HOPE VI Grant application, the Demolition Plan has taken steps to demolish buildings that had been previously scheduled for renovation under the HOPE VI application.  In fact, over eleven of the buildings have already been demolished.

102.    If the Demolition Plan is permitted to continue to go forward, those persons currently living in Jordan Park who are considered to have low income will be forced to live in a non-racially integrated area.

103.    If the Demolition Plan is permitted to continue to go forward, the reduction in dwelling units available for the current residents of Jordan Park will disparately impact the African-American and women residents.

104.    If the Demolition Plan revitalization plan is permitted to continue to go forward, nearly all of those displaced residents of Jordan Park will be denied eligibility to reside in replacement housing at Jordan Park.

105.    The Demolition Plan results in a net loss of over 200 units which were available to very low-income residents.  The loss of public housing for very low-income persons will have a disproportionate impact upon African-Americans, female-headed households, and children.  This is due to the fact that these groups are disproportionately eligible for public housing as compared to their representation in the general population.

35

Approximately 99% of the heads of households at Jordan Park are African-American. Approximately 85% of the residents of Jordan Park are female and 60% of the residents are 18 years of age or younger. One-third of Jordan Park residents, as of July 17, 1997, were younger than age 5.

106.   The SPHA has failed to relocate all the families who resided in buildings scheduled for renovation -- and now demolition -- to comparable units which are in decent, safe and sanitary condition.

107.   The Defendants' actions complained of herein will cause and have caused irreparable injury to the Plaintiffs Blake and RMC and Jordan Park residents:

a.      Defendants have denied the RMC participation in the planning process that produced the Demolition Plan, which provides for the demolition of residential units and the relocation and provision of permanent housing for those displaced; and

b.      The RMC has been dismantled and forced to divert its limited resources from its other organizational purposes and goals and direct these resources to discovery of and discussions about Defendants' Demolition Plan, to advocacy against the Demolition Plan, to monitoring the defendants' implementation of the Demolition Plan as it pertains to the demolition of Jordan Park buildings and the displacement of Jordan Park residents, to informing its members about the Demolition Plan and how it would affect Jordan Park residents, and to initiating this litigation to redress the lost opportunity to participate in the formulation and implementation of the Demolition Plan.

108.   Many of the RMC's members, all of whom are Jordan Park residents, will suffer irreparable injury because of the actions complained of herein, including destruction

of the community in which they have lived and established personal ties. Many RMC members will lose their homes, will suffer displacement, will be denied eligibility to reside in the replacement housing currently proposed by the Defendants, and/or will be denied the opportunity to reside in units targeted for demolition. By initiating this suit, the RMC seeks to further its purposes and protect the interests of these RMC members.

109.    RMC members have been irreparably injured in that the Defendants have used a closed-door process and terrorist activities, which excluded RMC members, to promulgate a plan to demolish Jordan Park, thereby effectively denying the residents consultation and participation which are required by HOPE VI.

110.    Plaintiffs have no adequate remedy at law. At this very moment, Jordan Park's historic buildings are being demolished. Plaintiffs are indigent and cannot afford to post security pursuant to Federal Rule of Civil Procedure 65(c).

## Claims Under Title VIII of the Civil Rights Act of 1968 - The Fair Housing Act

## COUNT I

111.    Plaintiffs reallege paragraphs 1-110.

112.    Defendants' actions, which will result in the net loss of over 200 public housing units that serve persons with very low incomes, will have a disproportionately adverse impact upon African-Americans, and therefore constitutes a violation of the Fair Housing Act, 42 U.S.C. § 3604(a), which provides in part that "it shall be unlawful . . . [t]o make unavailable or deny ... a dwelling to any person because of race . . . ."

WHEREFORE, Plaintiffs demand trial by jury, and that the Court enter a temporary restraining Order, and a preliminary and permanent injunction, enjoining the demolition of

37

Jordan Park, and Order Defendants to (1) comply with the 42 U.S.C. § 1437p, and the other pertinent statutes and (2) withdraw the Demolition Plan, and award attorneys' fees and costs, and for such other and further legal and equitable relief as the Court deems appropriate.

## COUNT II

113.    Plaintiffs reallege paragraphs 1-110.

114.    Defendants' actions, which will result in the net loss of over 200 public housing units that serve persons with very low incomes, will have a disproportionately adverse impact upon women and therefore constitutes a violation of the Fair Housing Act, 42 U.S.C. § 3604(a), which provides in part that "it shall be unlawful . . . [t]o make unavailable or deny . . . a dwelling to any person because of . . . sex . . . ."

WHEREFORE, Plaintiffs demand trial by jury, and that the Court enter a temporary restraining Order, and a preliminary and permanent injunction, enjoining the demolition of Jordan Park, and Order Defendants to (1) comply with the 42 U.S.C. § 1437p, and the other pertinent statutes and (2) withdraw the Demolition Plan, and award attorneys' fees and costs, and for such other and further legal and equitable relief as the Court deems appropriate.

## COUNT III

115.    Plaintiffs reallege paragraphs 1-110.

116.    Defendants' actions, which will result in the net loss of over 200 public housing units that serve persons with very low incomes, will have a disproportionately adverse impact upon children and therefore constitutes a violation of the Fair Housing Act, 42 U.S.C. § 3604(a), which provides in part that "it shall be unlawful . . . [t]o make unavailable or deny . . . a dwelling to any person because of . . . familial status . . . ."

WHEREFORE, Plaintiffs demand trial by jury, and that the Court enter a temporary restraining Order, and a preliminary and permanent injunction, enjoining the demolition of Jordan Park, and Order Defendants to (1) comply with the 42 U.S.C. § 1437p, and the other pertinent statutes and (2) withdraw the Demolition Plan, and award attorneys' fees and costs, and for such other and further legal and equitable relief as the Court deems appropriate.

## COUNT IV

117.    Plaintiffs reallege paragraphs 1-110.

118.    Defendants' actions, which provides that 67% of the replacement public housing units will not be available to very low income public housing residents, will deny over 50% of the displaced families, all of whom are African-American, replacement housing in a racially integrated neighborhood, and therefore the Demolition Plan constitutes a violation of the Fair Housing Act, 42 U.S.C. § 3604(a) & (b).

WHEREFORE, Plaintiffs demand trial by jury, and that the Court enter a temporary restraining Order, and a preliminary and permanent injunction, enjoining the demolition of Jordan Park, and Order Defendants to (1) comply with the 42 U.S.C. § 1437p, and the other pertinent statutes and (2) withdraw the Demolition Plan, and award attorneys' fees and costs, and for such other and further legal and equitable relief as the Court deems appropriate.

## Claim under Title VI of the Civil Rights Act of 1964

## COUNT V

119.    Plaintiffs reallege paragraphs 1-110.

120.    Defendants' actions, which will result in the net loss of approximately 200 public housing units that serve persons with very low incomes, will have a disproportionately

adverse impact upon African-Americans and therefore violates the Plaintiffs's rights secured by Title VI, which provides that "[n]o person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

WHEREFORE, Plaintiffs demand trial by jury, and that the Court enter a temporary restraining Order, and a preliminary and permanent injunction, enjoining the demolition of Jordan Park, and Order Defendants to (1) comply with the 42 U.S.C. § 1437p, and the other pertinent statutes and (2) withdraw the Demolition Plan, and award attorneys' fees and costs, and for such other and further legal and equitable relief as the Court deems appropriate.

## Claims under Section 1983 and Section 18 of the Act

## COUNT VI

121.    Plaintiffs reallege paragraphs 1-110.

122.    The Defendants are each "persons" within the meaning of 42 U.S.C. § 1983, and their actions described herein were taken under color of state law.  As described above, the Defendants failed to meaningfully consult with Plaintiff RMC in developing the Demolition Plan as it pertains to housing developed in lieu of the demolished housing, and its actions violated  Section 18 of the Act, 42 U.S.C. § 1437p(b) and HOPE VI grant requirements, 42 U.S.C. § 1437l, note.

WHEREFORE, Plaintiffs demand trial by jury, and that the Court enter a temporary restraining Order, and a preliminary and permanent injunction, enjoining the demolition of Jordan Park, and Order Defendants to (1) comply with the 42 U.S.C. § 1437p, and the other

40

pertinent statutes and (2) withdraw the Demolition Plan, and award attorneys' fees and costs, and for such other and further legal and equitable relief as the Court deems appropriate.

## COUNT VII

123. Plaintiffs reallege paragraphs 1-110.

124. The Defendants are each "persons" within the meaning of 42 U.S.C. § 1983, and their actions described herein were taken under color of state law.

125. Dorothy Majors has been a Jordan Park resident for 56 years. She was displaced by the demolition plan. She was forced to vacate her home, and move into another unit which was uninhabitable. The plumbing failed, and the unit was filthy. (See Exhibit "Q").

126. Mr. and Mrs. J.B. Hampton, who have lived in Jordan Park for over forty years, were forced to move out on 24 hours notice. The apartment they were moved into was also uninhabitable. There were no kitchen cabinets in the apartment they were moved into. The unit also had no air conditioning. (See Exhibit "P").

127. Gloria Freeney, an elderly resident of Jordan Park, was forced to move out of her home on less than 24 hours notice. The unit she was relocated to was "horrible" with unfinished kitchen cabinets and inadequate lighting. Another elderly woman nearby had been recently been raped when Ms. Freeney was relocated, and Ms. Freeney was "scared to death." (See Exhibit "R").

128. With respect to Defendants' relocation efforts of families residing in Jordan Park, the Defendants have violated the 42 U.S.C. §1437p(a).

41

WHEREFORE, Plaintiffs demand trial by jury, and that the Court enter a temporary restraining Order, and a preliminary and permanent injunction, enjoining the demolition of Jordan Park, and Order Defendants to (1) comply with the 42 U.S.C. § 1437p, and the other pertinent statutes and (2) withdraw the Demolition Plan, and award attorneys' fees and costs, and for such other and further legal and equitable relief as the Court deems appropriate.

### Claims under Section 1983 and 42 U.S.C. § 1437l

### COUNT VIII

129.    Plaintiffs reallege paragraphs 1-110.

130.    The Defendants are each "persons" within the meaning of 42 U.S.C. § 1983, and their actions described herein were taken under color of state law.  The Defendants' Demolition Plan, which will result in the net loss of over 200 public housing units that serve persons with very low incomes, is inconsistent with the City's Consolidated Plan to preserve affordable housing units.  Therefore the Demolition Plan violates HOPE VI (42 U.S.C. § 1437l, note) which requires that plans developed under HOPE VI be consistent with the Consolidated Plan.

WHEREFORE, Plaintiffs demand trial by jury, and that the Court enter a temporary restraining Order, and a preliminary and permanent injunction, enjoining the demolition of Jordan Park, and Order Defendants to (1) comply with the 42 U.S.C. § 1437p, and the other pertinent statutes and (2) withdraw the Demolition Plan, and award attorneys' fees and costs, and for such other and further legal and equitable relief as the Court deems appropriate.

## COUNT IX

131.    Plaintiffs reallege paragraphs 1-110.

132.    The Defendants are each "persons" within the meaning of 42 U.S.C. § 1983, and their actions described herein were taken under color of state law. The Demolition Plan, which provides that 67% of the replacement public housing units will not be available to very low-income public housing residents, is inconsistent with the City's Consolidated Plan, that provides for new SPHA initiatives that improve the quality of life for very low-income public housing residents. Therefore the Demolition Plan violates HOPE VI (42 U.S.C. § 1437l, note) which requires that plans developed under HOPE VI be consistent with the Consolidated Plan.

WHEREFORE, Plaintiffs demand trial by jury, and that the Court enter a temporary restraining Order, and a preliminary and permanent injunction, enjoining the demolition of Jordan Park, and Order Defendants to (1) comply with the 42 U.S.C. § 1437p, and the other pertinent statutes and (2) withdraw the Demolition Plan, and award attorneys' fees and costs, and for such other and further legal and equitable relief as the Court deems appropriate.

### Claim under Section 1983 and the Uniform Relocation Act

## COUNT X

133.    Plaintiffs reallege paragraphs 1-110.

134.    The Defendants are each "persons" within the meaning of 42 U.S.C. § 1983, and their actions described herein were taken under color of state law.

135.    Dorothy Majors has been a Jordan Park resident for 56 years. She was displaced by the demolition plan. She was forced to vacate her home, and move into

43

another unit which was uninhabitable. The plumbing failed, and the unit was filthy. (See Exhibit "Q").

136.    Mr. and Mrs. J.B. Hampton, who have lived in Jordan Park for over forty years, were forced to move out on 24 hours notice. The apartment they were moved into was also uninhabitable. There were no kitchen cabinets in the apartment they were moved into. The unit also had no air conditioning. (See Exhibit "P").

137.    Gloria Feeney, an elderly resident of Jordan Park, was forced to move out of her home on less than 24 hours notice. The unit she was relocated to was "horrible" with unfinished kitchen cabinets and inadequate lighting. Another elderly woman nearby had been recently been raped when Ms. Freeney was relocated, and Ms. Freeney was "scared to death." (See Exhibit "R").

138.    Defendants' relocation of Jordan Park residents violated the Uniform Relocation Act and regulations promulgated thereunder by:

a.    failing to adequately assess the needs and preferences of the displaced families. 42 U.S.C. § 4625(c)(1); 49 C.F.R. § 24.205(c)(2)(i);

b.    failing to give the displaced families reasonable opportunities to relocate to decent, safe, and sanitary replacement dwellings, not located in an areas of African-American concentration, that are within their financial means. 49 C.F.R. § 24.205(c)(2)(C); HUD Handbook 1-29(c)(3).

c.    failing to provide the displaced families comparable replacement housing, including housing that is decent, safe and sanitary. 42 U.S.C. §§ 4625(c)(3), 4630(3); 49 C.F.R. § 24.2(d) & (f).

44

WHEREFORE, Plaintiffs demand trial by jury, and that the Court enter a

temporary restraining Order, and a preliminary and permanent injunction, enjoining the

demolition of Jordan Park, and Order Defendants to (1) comply with the 42 U.S.C. §

1437p, and the other pertinent statutes and (2) withdraw the Demolition Plan, and award

attorneys' fees and costs, and for such other and further legal and equitable relief as the

Court deems appropriate.

RESPECTFULLY SUBMITTED this 24 day of April, 2000.

JONATHAN L. ALPERT, ESQUIRE
Florida Bar No. 121970
RYAN CHRISTOPHER RODEMS, ESQUIRE
TRIAL COUNSEL
Florida Bar No. 947652
SCOTT J. FLINT, ESQUIRE
Florida Bar No. 0085073
ALPERT, BARKER, RODEMS,
  FERRENTINO & COOK, P.A.
Post Office Box 3270
Tampa, Florida 33602
Phone: 813/223-4131
Facsimile: 813/228-9612
Attorneys for Plaintiffs

## **VERIFICATION**

I, Shirley Blake, under penalty of perjury, declare and affirm that I have read the

factual allegations of this Verified Complaint and that same are true.

DATED this _24_ day of April, 2000.

_Shirley Blake_
SHIRLEY BLAKE

STATE OF FLORIDA

COUNTY OF _Hillsborough_

BEFORE ME, the undersigned authority, personally appeared _Shirley Blake_, who is personally known to me, or who produced _drivers license_ as identification and, after being first duly sworn, deposed upon oath that the answers to the foregoing interrogatories are true and correct.

_M. Susann Stienecker_
NOTARY PUBLIC, State of Florida

[SEAL]

_____
Typed or Printed Name of Notary

My Commission Expires:

M. Susann Stienecker
MY COMMISSION # CC690619 EXPIRES
February 22, 2002
BONDED THRU TROY FAIN INSURANCE, INC

46

Exhibit/attachment exceeds page limitation for scanning; please see case file.